**Susan Mary NORRIS,**
**Plaintiff-Appellee,**
**Cross-Appellant,**

v.

**William W. WIRTZ, et al.,**
**Defendants-Appellants,**
**Cross-Appellees.**

Nos. 86–2112, 86–2176.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 23, 1987.

Decided May 11, 1987.

Rehearing and Rehearing En Banc
Denied June 11, 1987.

Matthew F. Kennelly, Cotsirilos & Crowley, Ltd., Chicago, Ill., for defendants-appellants, cross-appellees.

Francis J. Higgins, Bell-Boyd-Lloyd, Chicago, Ill., for plaintiff-appellee, cross-appellant.

Before BAUER, Chief Judge, and CUDAHY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

In 1967 and 1968 Susan Mary Norris, an adult beneficiary of her father's testamentary trust, consented to three sales of assets of the trust. On December 24, 1980, she filed this suit under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), arguing that her consent had been procured by fraud. We held in *Norris v. Wirtz*, 719 F.2d 256 (7th Cir.1983), that the complaint stated a claim. A jury trial was held on remand, and the jury concluded that Susan Norris was the victim of fraud. The district judge fixed damages at more than $800,000. We conclude that the suit is barred by the statute of limitations.

The sales were arranged by William W. Wirtz, and each purchaser was a corporation in which he had an interest. The assets in question were James Norris's shares of stock in close corporations—St. Louis Arena Corp., Arena Bowl, Inc., and Judge & Dolph, Ltd.—which had been owned jointly by the Norris and Wirtz families. St. Louis Arena and Arena Bowl repurchased their own stock, paying cash to the Norris estate (which was holding the assets pending the funding of the trusts);

Wirtz Corp. bought the Judge & Dolph stock on behalf of the Wirtz family. In each case the price was "book value", the corporation's accounting net worth divided by the number of shares outstanding; in no case was there an independent appraisal. William Wirtz had a conflict of interest because he was interested (as an investor in the buyers) in paying the lowest possible price, yet as Susan Norris's trustee and co-executor of James Norris's estate he was supposed to obtain the highest possible price. The corporations operate commercial businesses—St. Louis Arena Corp., for example, owns a large sports arena in St. Louis—so that the income stream is a more plausible starting point than the firm's book value as the basis of an estimate of worth.

Susan Norris knew these things or could have discovered them readily. The Wirtz family did not hide its interest in the corporations, and the Norris family well knew that the two families were the joint owners. The Wirtzes held their interest through Wirtz Corp., which owned most of the remaining stock in the three corporations, and in which William and his father Arthur M. Wirtz owned stock. The Wirtz family did not hide the nature of the companies or the lack of an independent appraisal; Susan Norris was given balance sheets, which were the sole stated basis of the valuation. The conflict of interest was apparent not only from the identity of the trustee but also from the language of James Norris's will, which appointed William Wirtz and Mary Norris, James's wife, as co-executors of the estate. (Because there are three Norrises—James, Mary, and Susan—and two Wirtzes—William and Arthur—we use first names for everyone from here on.) The will ordered the executors to hold or liquidate the stock as prudent, recognizing that either could be "to the best interests of Arthur M. Wirtz, and his family members, as well as to my estate and the trusts created hereunder, for which reason the Trustee" was given broad discretionary powers. Susan had or readily could have had in 1967 copies of the will, lists of the investors in each corporation, and other documents. Although she was 18 in 1967

and the transactions were substantial—her interest in the residuary trust was worth more than $4 million—she did not ask for additional documents or seek professional advice. She signed, apparently without thinking, what William and Mary asked her to sign. (In the case of Judge & Dolph, her approval was oral or nonexistent; memories conflict.) She claims, and the jury must have found, that not until more than 10 years later were her eyes opened to the injury done her by payment for the stock at book value.

The district court asked the jury whether Susan had tarried too long. In framing the instructions, the district court started from the proposition that the Blue Sky law of Illinois supplies the statute of limitations, in this case the three years provided by Ill.Rev.Stat. ch. 121½ ¶ 137.13 D. See *Suslick v. Rothschild Securities Corp.*, 741 F.2d 1000, 1004 (7th Cir.1984); *Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 125–27 (7th Cir.1972). The court concluded that the running of the time may be postponed by equitable considerations, either fraudulent concealment or the fact that William was Susan's trustee. The court looked to state law to find tolling principles—despite the many holdings of this court that federal law supplies the tolling doctrines, see *Suslick*, 741 F.2d at 1004; *Parrent*, 455 F.2d at 128; *Goldstandt v. Bear, Stearns & Co.*, 522 F.2d 1265, 1268–69 (7th Cir.1975); *Tomera v. Galt*, 511 F.2d 504, 509 (7th Cir.1975)—and held that Susan's status as the beneficiary of a trust tolled the running of the statute until she learned (or in the exercise of due diligence could have learned) of the trustee's treachery. Susan bore the burden of persuasion on these matters. E.g., *General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d 8 (1st Cir.1986). The court rejected Susan's argument that only a declaration by the trustee that (a) he has committed a fraud, or (b) he is no longer serving as a trustee, would start the three-year period. The instructions to the jury accordingly called on it to determine whether Susan learned of the fraud before December 24, 1977, or, if she was put on inquiry before that date, whether she exercised

due diligence but still could not discover the truth. The jury returned a single, special verdict to this compound question; it must have found that Susan neither knew of nor in the exercise of reasonable diligence could have discovered the fraud before the critical date.

On a post-trial motion for judgment notwithstanding the verdict, the district court concluded that although "there was much evidence that plaintiff did not act with due diligence" there was still enough evidence in Susan's favor to permit a rational jury to come to the conclusion it did. The defendants, who do not challenge the legal principles reflected in the charge to the jury, assert that the evidence of Susan's diligence is insufficient to support the jury's answer. Susan, however, defends her verdict on the theory that the time has yet to begin running, because William never announced his deceit. Susan claims that the law of trusts in Illinois supplies this tolling rule.

The view that state tolling rules apply when a federal court adopts a state statute of limitations has the support of *Board of Regents v. Tomanio*, 446 U.S. 478, 483–86, 100 S.Ct. 1790, 1794–96, 64 L.Ed.2d 440 (1980), and *Johnson v. Railway Express Agency*, 421 U.S. 454, 463–64, 95 S.Ct. 1716, 1721–22, 44 L.Ed.2d 295 (1975), which seem dispositive. *Tomanio* and *Johnson* hold that when federal law incorporates state limitations law, it incorporates the whole law including tolling rules. Our earlier, contrary holdings were based on *Campbell v. Haverhill*, 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed. 280 (1895), and *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946). These cases refer to the role of state law without, however, distinguishing absorption of the period of limitations from selection of the commencement date; therefore they do not directly support use of a federal tolling rule, although they hint at one. Yet in *Suslick*, decided after *Tomanio*, we intimated that plaintiffs may have things both ways, saying at 741 F.2d at 1004 that a "federal doctrine of equitable tolling is available" in addition to the state doctrines incorporated

under the authority of *Tomanio* and *Johnson*. (Mercifully, Susan does not ask us to "stack" tolling rules in this case, so we need not decide whether this is permissible.)

This is one tottering parapet of a ramshackle edifice. Deciding which features of state periods of limitation to adopt for which federal statutes wastes untold hours. *Tellis v. United States Fidelity & Guaranty Co.*, 805 F.2d 741, 747 (7th Cir.1986) (Ripple, J., dissenting). Never has the process been more enervating than in securities law. There are many potentially analogous state statutes, with variations for different kinds of securities offenses and different circumstances that might toll the period of limitations. Both the bar and scholars have found the subject vexing and have pleaded, with a unanimity rare in the law, for help. E.g., Louis Loss, *Fundamentals of Securities Regulation* 1164–75 (1983); Thomas Lee Hazen, *The Law of Securities Regulation* § 13.8 & n. 2 (1985) (collecting authority); *Report of the Task Force on Statute of Limitations for Implied Actions*, 41 Bus.Law. 645 (1986). As the ABA's Committee on Federal Regulation of Securities observed, *id.* at 646–47, 656–57, the courts of appeals disagree on every possible question about limitations periods in securities cases. Only Congress or the Supreme Court can bring uniformity and predictability to this field; we have vowed to stand pat rather than make things worse by exchanging one conflict for another. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 815 F.2d 452, 455 (7th Cir.1987). Still, to the extent there is uncertainty about how to employ existing doctrines, we must take into account the interests of uniform application and the plan of the securities acts.

That plan called for uniform statutes of limitations *coupled with statutes of repose*. The Securities Act of 1933 gave the purchaser two years from the date of discovery of the fraud, but in no event more than 10 years after the sale. 48 Stat. 84 (1933). When Congress enacted the Securities Exchange Act of 1934, it amended this statute (§ 13, 15 U.S.C. § 77m) and added a battery of new statutes of limitations, one for each of the express rights of action in the '34 Act. See §§ 9(e), 16(b), 18(c), and 29(b), 15 U.S.C. §§ 78i(e), 78p(b), 78r(c), and 78cc(b). The express periods added or amended in 1934 allow suit no later than one year after the plaintiff discovers the facts, and in no event more than three years after the transaction in question. (Section 16(b), 15 U.S.C. § 78p(b), sets two rather than three years as the period of repose.) The legislative history in 1934 makes it pellucid that Congress included statutes of repose because of fear that lingering liabilities would disrupt normal business and facilitate false claims. It was understood that the three-year rule was to be absolute. The ABA's task force concludes that it is "inescapable ... that Congress did not intend equitable tolling to apply in actions under the securities laws." 41 Bus.Law. at 655. The legislative history supports this position. See H.R.Conf.Rep. No. 1838, 73d Cong., 2d Sess. 32, 36, 42 (1934); 78 Cong.Rec. 8198–8203 (May 7, 1934) (Senate amendments carried to the conference); and the principal exchanges during the Senate hearings, which are collected in 6 J.S. Ellenberger & Ellen P. Mahar, *Legislative History of the Securities Act of 1933 and Securities Exchange Act of 1934* 6565–66, 6718, 6993 (1973), and 7 *id.* at 7743–44.

The problem with this scheme—which would have cut off Susan's right to sue in 1970 and 1971—is that no one anticipated the development of "implied" rights of action. Because Congress did not provide for a private suit to enforce § 10(b), it did not provide a corresponding statute of limitations. Although most statutes of limitations in the '33 and '34 Acts are 1–3 combinations (the shorter of one year from discovery, three years from the initial public offering or other transaction), each applies to an associated express right of action. Thus when courts began to imply private rights of action from other substantive provisions, they did not find corresponding statutes of limitations. In accordance with long federal practice, they borrowed the statutes of limitations for "analogous" state law. Which state law, and with what

tolling rules, has been nettlesome ever since.

As practitioners and scholars agree that the result is a mess, they also believe that the courts missed a turn. Courts should have drawn the periods of limitations for the implied rights from the periods of limitations for the express rights. Congress has not been silent about limitations for securities law in general, the usual problem that leads federal courts to turn to state law; it has been silent only with respect to rights of action it did not create. Whenever it created a federal right to sue, it also created a statute of repose no longer than three years. That is what the courts should have used. As Professor Loss puts it:

> This reference to state law makes for a great amount of utterly wasteful litigation.... Would it not be eminently more consistent with the overall statutory scheme to look to what Congress itself did when it was thinking specifically of private actions in securities cases than to a grab-bag of more or less analogous state statutes?

*Fundamentals of Securities Regulation* at 1168–69. Professor Hazen, and the ABA's task force, which collect still more views, are in accord. E.g.: "Against the clear evidence that Congress affirmatively intended that no tolling doctrine would be available for the express limitations periods for securities actions, it seems implausible that Congress intended such a doctrine to apply to the implied 10b–5 cause of action." 41 Bus.Law. at 655 (note omitted). The American Law Institute's *Federal Securities Code* § 1727(b) and comment 3(b) (1980), which the Securities and Exchange Commission endorsed, came to the same conclusion. See also *Sentry Corp. v. Harris*, 802 F.2d 229, 231 n. 1 (7th Cir.1986), looking longingly in this direction.

It is too late for an inferior federal court to turn back the clock, see *Angelos*, especially in a case in which the defendants did not request such a fundamental alteration

of doctrine. *City of Springfield v. Kibbe*, — U.S. —, 107 S.Ct. 1114, 1115–16, 94 L.Ed.2d 293 (1987). But it is timely yet to take account of the original plan in deciding how "liberal" the tolling rules should be, when existing precedent gives leeway. We should not forget that the securities laws do not admit of tolling, that there is a three-year statute of repose. The statute of repose is designed to deal with the problems of proof—and the invitation to file claims easier to advance than to refute— that arise if long-delayed litigation is permissible. This properly may inform the shaping of the implied rights of action. Cf. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 571–74, 99 S.Ct. 2479, 2486–88, 61 L.Ed.2d 82 (1979); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 735–49, 95 S.Ct. 1917, 1925–31, 44 L.Ed.2d 539 (1975). We cannot overlook it here, for several of the participants died or lost their memories during the 19 years between the sales and the trial.

■ Susan wants us to incorporate into the tolling rules the doctrines of trust law dealing with beneficiaries' litigation against trustees. According to Susan, these doctrines in Illinois postpone the start of the period of limitations essentially until the trustee confesses his wrongdoing or repudiates his office. If this is indeed the law of Illinois for ordinary trust cases, a subject on which we express no opinion, it is not a tolerable rule for securities cases. It would move us farther from the plan of '34 rather than closer to it. It would excuse investors from all duty of inquiry, even after they have been put on actual notice that something is amiss. In many cases it would give investors a perpetual put or call, allowing them to speculate on the market without risk to themselves. Susan has not pointed to any opinion applying such a rule to a securities case. Illinois recently amended its securities law to ensure that it, too, contains a statute of repose.* We could not adopt the trusteeship

---

* An amendment to ¶ 137.13 D effective January 1, 1986, provides that the plaintiff has three years from the date of the sale, "provided, that if the party bringing the action neither knew nor

in the exercise of reasonable diligence should have known of any alleged violation ..., the 3 year period provided herein shall begin to run upon the earlier of (1) the date upon which the

tolling rules in securities law without effectively eliminating statutes of limitations for intra-family securities frauds. The rule of law applicable to this case therefore is, as the district court concluded, that the time to file suit begins to run when the investor either knows or in the exercise of reasonable diligence could have discovered the facts on which the suit is based. The investor need not actually know the facts or appreciate their significance; the "could have discovered" branch of the test is objective. See *United States v. Kubrick*, 444 U.S. 111, 120–24, 100 S.Ct. 352, 358–60, 62 L.Ed.2d 259 (1979); *Nemmers v. United States*, 795 F.2d 628, 631–33 (7th Cir.1986). And whether the investor actually exercised diligence also is irrelevant. The question is not whether she did, but whether diligence would have paid off. Failure to be diligent is no excuse, as *Angelos* holds.

The facts are largely undisputed, although the parties contest the inferences. Susan received balance sheets in 1967 showing how the price for the stock had been derived. She then had (or had access to) both her father's will and the identity of the investors in the three corporations. Neither Susan nor those with whom she dealt can remember what, if anything, she was told about the transactions beyond what appears in the documents. The balance sheets, coupled with the nature of the corporations, the lack of an independent appraisal, and William's conflict of interest, were the principal evidence that the defendants had defrauded Susan by representing (explicitly or implicitly) that the price was a realistic approximation of the stocks' value. Although Susan, only 18 at the time, did not appreciate what was going on and why an appraisal was called for, she was legally

an adult and of sound mind. The statute begins to run when a reasonable person would have appreciated the need for further inquiry. An objectively reasonable person would have appreciated the need for further inquiry in 1967.

■ We recognize that *Suslick* and some earlier cases in this court hold that the time may be tolled "where the fraud goes undiscovered even though the defendant does nothing to conceal it." 741 F.2d at 1004; see also *Angelos*, 815 F.2d at 456–57 (collecting cases). None of our cases, however, and none of the state cases on which Susan relies, dealt with a deceit so easy to uncover from documents in hand. The language in *Suslick* addresses the situation in which one party tells a lie that is not discovered for a long time; that he did not tell a second lie to cover up the first does not necessarily mean that the statute commenced to run with the first; the clock does not start (under the tolling principles ·we adopted in earlier cases) until the defrauded investor knew the truth or was put on notice of the need for inquiry. When the defendant lies and the other party does not reasonably investigate, however, the time starts to run immediately, as *Angelos* holds. "[T]he plaintiff must allege and prove that [she] remained unaware of the fraud 'without any fault or want of diligence or care on [her] part'." 815 F.2d at 456. *Suslick* makes the same point, 741 F.2d at 1004. The documents handed to Susan in 1967, coupled with the identity of the trustee and the corporations in question, were enough to put a reasonable person on notice of the need for inquiry. Such an inquiry promptly would have turned up everything necessary to file a complaint.

---

party bringing such action has actual knowledge of the alleged violation of this Act, or (2) the date upon which the party bringing such action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of this Act; but in no event shall the period of limitation so extended be more than 2 years beyond the expiration of the 3 year period otherwise applicable." Defendants do not argue that this five-year statute of repose applies to Susan's case. They also do not contend that the three-year period applicable before January 1, 1986, was

itself a statute of repose—although this is the interpretation given it in a gloss attached to the amendment. See Ill.Rev.Stat. ch. 121½ ¶ 137.13 at p. 118 (West 1986 Pocket Part): "Heretofore, the three-year statute of limitations could be an absolute bar to an action even if discovery was not reasonable or subverted." This suggests that Illinois has had a statute of repose all along, and that only the pre-*Tomanio* overlay of "federal" tolling doctrines has prevented its implementation. No matter what we make of this, the status of the law in Illinois hardly calls for expansive tolling in securities cases.

We need not rest entirely on this. Even if Susan were so under the sway of William in 1967–68 that a reasonable person in her position would not have commenced an inquiry, by 1975 she was no longer so pliable. Susan was then emancipated and living in New Jersey. She hired Emil S. Cuccio, a lawyer, to investigate why she was receiving only $24,000 per year from the estate (the trusts were not funded until 1977) and why the Wirtzes were not giving the Norris family public credit for their ownership of the Chicago Black Hawks (a hockey team owned by the Wirtz family and James's estate); Susan also asked Cuccio to obtain for her employment with the Black Hawks. She testified that the Wirtz family had been putting her off, treating her as a child who was not entitled to explanations. She hired Cuccio to get explanations and results. No child, Cuccio was given access to every document he requested during the next two years. Among the documents he did *not* request were the papers concerning the stock sold in 1967 and 1968.

The parties have debated the scope of Cuccio's charge. Susan says that she hired Cuccio to look after her allowance, her employment, and her family's credit in Black Hawks programs. The defendants say that Cuccio had a general charge. We shall never know, for during both Susan's and Cuccio's depositions Susan's current lawyers objected (on grounds of the attorney-client privilege) to efforts to elicit the scope of Cuccio's employment. The district judge declined to compel Susan and Cuccio to answer the questions. But we do know that Cuccio's first letter to William Wirtz, dated January 20, 1976, stated: "[O]ur client has authorized us to seek an inventory of assets of the estate as well as intermediate accountings prepared between the date of death of the Testator and the date of final settlement of the estate.... In addition thereto, with respect to the trust created by James D. Norris for the benefit of Susan Norris, our client desires an accounting of the principal and income derived from said trust from the date of death of her father up to and including the present time." This suggests a fairly broad charge. Cuccio represented Susan in

all dealings with the Wirtzes from then through 1977, including their request that Susan approve the sale of additional stock in November 1977 to raise cash to pay the estate's taxes. William proposed that the estate sell the stock to the issuing corporation (controlled by Wirtz Corp.) at book value; Cuccio advised Susan that this was not an appropriate method of valuation and that an independent appraisal should be obtained. If the time starts to run as late as this advice, the suit is still untimely.

■ In November 1977 Susan knew that the method of valuation used in 1967 and 1968 was flawed. Since 1975 Susan had been dealing with William at arms' length. Susan's lawyer had a charge capacious enough to lead him to ask for all accountings of the estate and trusts. The parties agree that Cuccio received what he asked for. Like the district judge, we are flabbergasted that Cuccio never asked about the sales of assets or recognized the significance of making a Wirtz the executor of James's estate, with the conflicts that ensued. But all of this is unimportant. An expert's inattention or bad advice does not delay the time to sue. *Kubrick*, 444 U.S. at 124, 100 S.Ct. at 360. As of 1975, when Susan hired Cuccio to deal with the Wirtzes, the question was whether Cuccio knew (or could readily have learned) enough to call for inquiry. The answer to that is yes, even resolving all doubt in Susan's favor. See *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1213 (7th Cir. 1985); *LaMontagne v. American Products, Inc.*, 750 F.2d 1405, 1410 (7th Cir. 1984).

Cuccio knew that the Wirtzes were rebuffing Susan's inquiries; he must be charged with knowledge that the estate's assets were largely in closely held firms jointly controlled by the Wirtz and Norris families; he knew that the co-executor and trustee had a conflict of interest; he had to know (and Susan did know) that the estate sold assets to raise funds; and in November 1977 he was confronted with a proposal identical in all material respects to the three sales of 1967–68. Coupled with what Susan knew in 1967, Cuccio had enough to

spark an inquiry, indeed to file this suit, in November 1977. Susan does not identify any event after 1977 that tipped her off; so far as we can tell, it simply took a long time for the available information to sink in (or for Susan to decide to act). Susan prevailed before the jury with little more than what was available in November 1977.

We are not anxious to set aside jury verdicts, especially after a judge with extensive experience in securities law has concluded that the evidence is sufficient—although, she believed, barely so. But our independent review of the record leads to a firm belief that by November 1977 Susan Mary Norris (in conjunction with Cuccio) knew the essential facts. That Susan may have forgotten things by 1977 is unimportant; a plaintiff's obliviousness may not be visited on the defendants. *Kubrick*, 444 U.S. at 124, 100 S.Ct. at 360. *Nemmers*, 795 F.2d at 632. What Susan and Cuccio did not know, a modest inquiry would have unveiled. Unless lack of activity or perspicacity indefinitely postpones the start of the statute of limitations, Susan's time began running no later than November 1977, and it probably had lapsed before then. This suit is untimely, and the judgment is

Reversed.

CUDAHY, Circuit Judge, dissenting:

The admittedly close question of the statute of limitations has gone to a properly instructed jury, which returned a special verdict for the plaintiff. An experienced trial judge has refused to set that verdict aside. Nothing cited by the majority justifies a different result here.

At the time of the fraudulent transactions, Susan Norris was an 18 or 19–year old girl. She was dealing with William Wirtz, who was both a trustee and a close family friend whom she had known all her life. William's father, Arthur, had been a business partner of Susan's father for many years. Susan "trusted Bill Wirtz and Arthur Wirtz and Ken Scanlon [the Wirtz lawyer] completely." The Wirtzes, apparently in line with their usual view of women's place, excluded Susan and her mother from any role in the businesses of which

they were joint owners. Susan Norris claimed that she had never even heard of the three corporations in which she sold out her interests, in effect, to her trusted friends and fiduciaries. She had a high school education, no business experience, no personal attorney, no investment advisor and no stockbroker at the time of the sales. The jury could quite reasonably conclude that a person in Susan's position would not realize that book value is a very questionable measure of the worth of a firm. (Indeed, the defendants argued in the district court that book value was an accurate measure of the companies' worth.) The defendants did not even bother to obtain Susan's signature consenting to the 1968 transaction. Instead they merely told the court that all interested parties had "verbally approved" so that "no notice to any such interested person is expedient." There is really no plausible argument that Susan should have discovered the fraud before she hired her own attorney in late 1975.

There is also sufficient evidence in the record from which the jury could have concluded that Susan, even in the exercise of due diligence, could not have discovered the fraud in 1975 when she hired Cuccio. Susan claims that she did not turn to Cuccio out of some concern that she had been defrauded. At the time, her mother was incapacitated by illness and she was "feel[ing] very alone." As a woman, she had been excluded by the Wirtzes from family businesses and "didn't really know what was going on." Although a letter written by Cuccio to William Wirtz in January 1976 suggests that Susan might have authorized Cuccio to examine past transactions, other evidence suggests that all of the tasks with respect to which Susan looked to Cuccio were forward-looking, relating to such matters as securing an increase in Susan's allowance and getting her a job with the Black Hawks. During the period Susan was represented by Cuccio, neither she nor Cuccio learned anything about the fraudulent 1967 and 1968 transactions. None of the properties involved was specifically mentioned in the Norris will, and Cuccio would not have been put

on notice from that source. In addition, during the time Cuccio worked for Susan, the Wirtzes were still in a fiduciary relationship with Susan. Lacking actual knowledge, she should not be barred merely because her fiduciary was in a position to breach his trust. And there was nothing in the probate court records from which Cuccio could have suspected fraud in the 1967 and 1968 sales. One could go on citing evidence and circumstances which tend to support the jury verdict.

When an adolescent girl is allegedly defrauded by her trustee, who is also an old family friend and essentially a surrogate father, under circumstances like these, I see little reason to distrust the jury verdict. The jury had ample grounds for deciding as it did. Contrary to the approach taken by the majority, so long as there is sufficient evidence in the record to support the jury's verdict, it is not for this court to reweigh the evidence.

I therefore respectfully dissent.