724 F.Supp. 1232 (1989)
Daniel McCOOL, Ted R. Potempa, John Pellettiere and Kenneth A. Stankievech, Plaintiffs,
v.
STRATA OIL COMPANY, an Illinois corporation, Richard A. Miller and Joseph Jocheim, Defendants.
No. 89 C 3339.
United States District Court, N.D. Illinois, E.D.
November 16, 1989.
*1233 David C. Roston and Peter S. Lubin, Altheimer & Gray, Chicago, Ill., for plaintiffs.
Cary S. Fleischer, Chuhak Tecson Kienlen Feinberg Grasso & Josephson, P.C., Chicago, Ill., for defendants.

ORDER
BUA, District Judge.
Plaintiffs in this action bring claims under federal securities laws and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Plaintiffs also assert various pendent state claims. Based on statute of limitations arguments, defendants have now moved for summary judgment on plaintiffs' securities and RICO claims and for dismissal of plaintiffs' pendent state claims. For the reasons stated herein, defendants' motion is granted in part and denied in part.

FACTS
Sometime prior to 1984, defendants Richard A. Miller and Joseph Jocheim formed a partnership named "Strata Oil."[1] The partnership was formed to procure investments in certain oil wells located in Illinois and Oklahoma and to manage and operate the oil wells. Some of these oil wells were situated on a tract of land in Oklahoma known as the "Lowe Property." In January 1984, Miller met with plaintiffs Daniel McCool, Ted Potempa, and John Pellettiere to discuss investing in the oil wells located on the Lowe Property. Plaintiffs claim that at the meeting, Miller represented that for an investment of $24,000, plaintiffs would receive: (1) a tenancy in common interest in a mineral lease on the Lowe Property, (2) a working interest in the first well drilled on the Lowe Property, and (3) the opportunity to invest in additional wells drilled on the Lowe Property by Strata Oil. According to plaintiffs, Miller stated that the $24,000 would be paid in two installments: an initial payment of $17,000 ($13,000 for a tenancy in common interest in the leasehold and $4,000 for drilling the first well) and a second payment of $7,000 for completion costs on the first well. Miller allegedly stated that the second payment would be made only if the well was "commercially successful." Plaintiffs claim Miller also made the following representations: that maintenance costs for each well drilled on the Lowe Property would be $80 per month, that the Lowe Property has not been worked extensively by previous oil drillers, and that wells drilled on the Lowe Property would not be considered commercially successful unless they produced at least fifty barrels of oil per day.
Not long after the meeting, McCool contacted plaintiff Kenneth Stankievech. With Miller's knowledge and approval, McCool informed Stankievech of the investment opportunity offered by Miller. In February 1984, McCool, Potempa, Pellettiere and Stankievech each paid $17,000 to Strata Oil. Each plaintiff signed a written agreement evidencing his investment. In relevant part, the agreements provided:
This will acknowledge receipt of the sum of $17,000.00 ... said sum of money being payment in consideration of 1/32nd working interest, subject to a 11/42 of 7/8 overriding royalty interest in a certain portion of a leasehold estate ...
* * * * * *
1. It is understood that payment of said sum of money ... is a payment for the drilling expense for a test well to be drilled on said leasehold estate. That it is further understood that [each plaintiff] shall provide and will pay [$]7,000.00 of the cost of completing and equipping said test well in the event oil and/or gas is found. It is further understood that the legal effect of this agreement is that [each plaintiff] bears a 1/32 share of the cost of operation and maintenance of said well when it is placed on production.
* * * * * *

*1234 16. This is solely a receipt and agreement for the purchase of a working interest in a certain portion of the leasehold estate hereinbefore described....
On March 9, 1984, Strata Oil and its joint venture partner, Quest Petroleum, Ltd., purchased a mineral lease in the Lowe Property. Defendants did not name plaintiffs as owners of tenancy in common interests in the lease. On about May 31, 1984, plaintiffs made their second payments of $7,000 each. Subsequently, based on Miller's representations at the January 1984 meeting, plaintiffs made further investments in other oil wells developed by Strata Oil and Quest Petroleum, Ltd. Each plaintiff invested an additional $12,000 in October 1984, $12,900 in May or June of 1985, and $12,900 in August of 1985. These additional investments were made pursuant to signed form contracts containing the same provisions as the contracts evidencing plaintiffs' initial investments.
From 1984 to present, defendants mailed various newsletters and other correspondence to plaintiffs describing the status and progression of the oil wells. Plaintiffs claim that this correspondence fraudulently misled them and concealed from them the fact that defendants had not named them as tenants in common in the mineral lease on the Lowe Property. Defendants also periodically mailed "division orders" to plaintiffs. These division orders were supposed to confirm the percentage interests in the royalty payment stream due to each investor. Plaintiffs maintain that these division orders were fraudulently redacted and edited so as to mislead plaintiffs and prevent them from discovering that they did not really own tenancy in common interests in the Lowe Property mineral lease. Plaintiffs contend that because of defendants' fraud, they had no indication that they did not own tenancy in common interests until September or October of 1985, when defendants mistakenly mailed unredacted division orders to them. In August 1988, plaintiffs obtained title abstracts which confirmed that they did not own tenancy in common interests in the Lowe Property lease. Plaintiffs claim they subsequently discovered that maintenance costs for the wells were greater than $80 per month and that the Lowe Property had been worked extensively by previous oil drillers. Plaintiffs then initiated this action on April 24, 1989.

DISCUSSION

I. Count I: Federal Securities Fraud

The statute of limitations applicable to a federal securities fraud claim in Illinois is three years. Teamsters Local 282 Pension Trust Fund v. Angelos, 815 F.2d 452, 455 (7th Cir.1987); Parrent v. Midwest Rug Mills, Inc., 455 F.2d 123, 126 (7th Cir.1972). Generally, the statute of limitations begins to run when the claim arises, and a cause of action arises under the anti-fraud provisions of the federal securities laws on the date the sale of the securities occurs. See Suslick v. Rothschild Securities Corp., 741 F.2d 1000, 1005 (7th Cir.1984). Defendants point out that plaintiffs made their initial investments with defendants in February 1984. Therefore, defendants argue, the statute of limitations on plaintiffs' securities claims began to run in February 1984 and expired in February 1987, making Count I of this action untimely.
Plaintiffs acknowledge that they made each of their investments with defendants more than three years before filing the instant action. Nevertheless, plaintiffs argue that under the doctrine of equitable tolling, their securities claim is not time-barred. In a fraud case, the doctrine of equitable tolling operates to delay the start of the statute of limitations period in two situations.
First, the doctrine will toll the running of the statute of limitations where the fraud goes undiscovered even though the defendant does nothing to conceal it. The plaintiff, however, must exercise due diligence in attempting to uncover the fraud. In the second situation in which equitable tolling applies, the fraud goes undiscovered because the defendant has taken positive steps after commission of the fraud to keep it concealed. This type of fraudulent concealment tolls the limitations *1235 period until actual discovery by the plaintiff.
Suslick, 741 F.2d at 1004. Plaintiffs invoke both aspects of the equitable tolling doctrine. First, plaintiffs contend that after they made their investments, defendants took positive steps to conceal the fact that plaintiffs had not really acquired tenancy in common interests in the Lowe Property. Plaintiffs maintain that defendants concealed this fact in three ways: (1) by failing to provide plaintiffs with prospectuses when selling the securities to plaintiffs, (2) by editing the division orders sent to plaintiff to exclude material information which may have caused plaintiffs to learn that they were not tenants in common in the Lowe lease, and (3) by mailing misleading correspondence to plaintiffs which referred to the Lowe Property as "our lease," "our property," and "our venture."
The court finds that defendants' actions did not amount to active concealment of their fraud. In fact, defendants' post-fraud conduct virtually disclosed some of their own alleged misrepresentations. Defendants' misrepresentations concerning the nature of plaintiffs' interests allegedly occurred at the January 1984 meeting. Plaintiffs claim that at the meeting, Miller misrepresented that plaintiffs would receive tenancy in common interests in the Lowe lease. Subsequent to that meeting, however, defendants executed written agreements with each plaintiff which specifically stated that plaintiffs were receiving only working interests in the Lowe Property. In light of the express language in these written agreements, plaintiffs cannot now contend that defendants concealed the nature of plaintiffs' interests.
Moreover, none of defendants' actions of which plaintiffs complain can be considered active concealment of plaintiffs' interests. Defendants' failure to provide prospectuses is more properly viewed as part of the fraud itself, not concealment of the fraud. Cf. Board of Education of Evanston Township High v. Admiral Heating & Ventilation, Inc., 94 F.R.D. 300, 302 (N.D. Ill.1982). With regard to the correspondence sent to plaintiffs, the import of some of defendants' references  such as "our property" and "our lease"  may have been unclear. This ambiguous phraseology was perhaps susceptible to several interpretations. However, the minor ambiguities in defendants' letters did not make them misleading, when viewed as a whole. In numerous other parts of the letters, for instance, defendants somewhat clarified the ambiguities by specifically thanking plaintiffs for their investments in the oil wells, not in the leasehold estate. Therefore, the court finds that defendants' letters were not so inaccurate or deceptive as to constitute active concealment of plaintiffs' interests.
Similarly, the division orders were not so incomplete that they amounted to fraudulent concealment of plaintiffs' interests. The division orders sent to each investor listed the investor's percentage interest in the royalty payment stream and contained an abbreviation which represented the nature of the investor's interest. Plaintiffs complain that defendants deliberately redacted the listings of other investors from each plaintiff's division order so that plaintiffs would remain unaware that they only possessed working interests. However, the division orders sent to plaintiffs included the notation "WI", which stood for "working interest." This notation, especially when viewed in connection with defendants' disclosures in the written agreements signed by plaintiffs, belies plaintiffs' claim that defendants affirmatively concealed the nature of plaintiffs' interests. Accordingly, the court finds that defendants did not fraudulently conceal plaintiffs' claim.
Plaintiffs argue that even if defendants did not actively conceal their fraud, the statute of limitations on plaintiffs' securities fraud claim was equitably tolled until October 1, 1985, because prior to that date they had not yet discovered defendants' fraud. To successfully invoke the equitable tolling doctrine where there is no concealment of the fraud, a plaintiff must show that he remained unaware of the fraud and that he exercised due diligence *1236 in attempting to discover it. Teamsters, 815 F.2d at 456 & n. 4, Suslick, 741 F.2d at 1004. In the instant case, plaintiffs satisfy these requirements with respect to only one of the alleged misrepresentations and omissions on which they base their securities fraud claim. Specifically, there is nothing which indicates plaintiffs discovered that the Lowe Property had been worked extensively by previous oil drillers; nor is there any evidence which suggests that plaintiffs failed to exercise due diligence in attempting to discover that fact. Therefore, to the extent that plaintiffs' securities fraud claim is based on defendants' misrepresentation that the Lowe Property had not been worked extensively by previous oil drillers, the statute of limitations on plaintiffs' claim was equitably tolled until October 1, 1985, and the claim is not time-barred.[2]
However, to the extent that plaintiffs' securities fraud claim is based on defendants' other alleged misrepresentations, the equitable tolling doctrine does not apply. Defendants' other misrepresentations allegedly were that plaintiffs would receive tenancy in common interests, that plaintiffs were responsible for $80 per month in maintenance costs on the well, and that plaintiffs' second payments of $7,000 were not due unless the well produced at least fifty barrels of oil per day. Each of these alleged misrepresentations was contradicted by the written investment agreements which plaintiffs signed. As discussed above, two separate provisions of the agreements expressly stated that plaintiffs were receiving working interests. The agreements also clearly stated that plaintiffs were responsible for 1/32 of all maintenance and operation costs, not merely $80 a month. In addition, paragraph one of the agreements contained no condition on plaintiffs' promise to make the second payment of $7,000. Therefore, at the time they executed the agreements, plaintiffs had sufficient notice that defendants had previously misrepresented the nature of plaintiffs' interests, the amount owed by plaintiffs for maintenance, and the conditions under which the second payment of $7,000 became due. See Norris v. Wirtz, 818 F.2d 1329, 1334 (7th Cir.1987) (finding that a securities fraud plaintiff had failed to exercise diligence where "[t]he documents handed to [plaintiff] ... were enough to put a reasonable person on notice of the need for inquiry. Such an inquiry promptly would have turned up everything necessary to file a complaint."), cert. denied, 484 U.S. 943, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987).
The court rejects plaintiffs' argument that the form contracts they signed were too complex to put them on notice. The contracts were relatively short and plainly stated the nature of the agreement between the parties. The court also rejects plaintiffs' contention that they were not on notice of defendants' fraud due to paragraph 18 of the agreement, which states, "The parties hereto shall in no way be deemed to be partners or mining partners, but are now, and shall continue to be tenants in common in the property." Admittedly, this provision is directly contradictory to other provisions in the lease which affirmatively state that plaintiffs were only purchasing a working interest. Nevertheless, the court finds that these contradictory provisions at least gave plaintiffs sufficient information from which they could have discovered defendants' fraud had they exercised due diligence. Instead of diligently investigating defendants' representations, however, plaintiffs simply presumed that they owned tenancy in common interests. This failure to exercise diligence in attempting to discover defendants' alleged fraud prevents plaintiffs from now invoking the equitable tolling doctrine with respect to defendants' representations that were contrary to the written *1237 agreement. See Norris, 818 F.2d at 1334. As a result, the statute of limitations began to run on these claims when plaintiffs signed the agreements, and it expired three years later. Therefore, to the extent that plaintiffs' securities fraud claim is based on defendants' representations concerning the nature of plaintiffs' interests, the payment of maintenance costs, and the payment of the $7,000, it is time-barred.

II. Count II: RICO

The parties agree that a four-year statute of limitations applies to civil RICO actions. See Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 107 S.Ct. 2759, 2764-66, 97 L.Ed.2d 121 (1987); Ashland Oil, Inc. v. Arnett, 875 F.2d 1271, 1282 (7th Cir.1989). The parties disagree, however, as to when the statute of limitations begins to run in a civil RICO case. Plaintiffs maintain that the limitations period commences when defendant commits the last predicate act which is part of defendants' pattern of racketeering. This position has been adopted by several judges in this district. See Norris v. Wirtz, 703 F.Supp. 1322 (N.D.Ill.1989) (Marovich, J.); Citicorp Savings of Illinois v. Streit, No. 84 C 7471 (N.D.Ill. April 6, 1987) (1987 WL 9318) (McGarr, J.); Carlstead v. Holiday Inns, Inc., No. 86 C 1927 (N.D.Ill. March 26, 1987) (1987 WL 9024) (Plunkett, J.); County of Cook v. Berger, 648 F.Supp. 433, 433-35 (N.D.Ill.1986) (Kocoras, J.); Griggs v. Robinson Securities, No. 84 C 4679 (N.D.Ill. May 9, 1985) (1985 WL 1163) (Grady, J.); Newman v. Wanland, 651 F.Supp. 20, 22 (N.D.Ill.1986) (Williams, J.). Defendants, on the other hand, contend that the statute begins to run when plaintiffs discovered or should have discovered that they sustained an injury from a RICO violation. This "discovery rule," as it has been called, was followed by this court in a previous case entitled Abernathy v. Erickson, 657 F.Supp. 504, 507-08 (N.D.Ill.1987). In Abernathy, the court relied on the decisions of the three circuit courts  the Eleventh, Eighth, and Ninth Circuits  which at the time of Abernathy had adopted the discovery rule. See Bowling v. Founders Title Co., 773 F.2d 1175, 1178 (11th Cir. 1985), cert. denied, 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1986); Compton v. Ide, 732 F.2d 1429, 1433 (9th Cir.1984); Alexander v. Perkin Elmer Corp., 729 F.2d 576, 577 (8th Cir.1984). Since Abernathy, the Fifth, Second, Fourth, and D.C. Circuits have also followed the discovery rule. See Riddell v. Riddell Washington Corp., 866 F.2d 1480, 1489-90 (D.C.Cir. 1989); Bankers Trust Co. v. Rhoades, 859 F.2d 1096, 1102 (2d Cir.1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989); Pocahontas Supreme Coal Co., Inc. v. Bethlehem Steel Corp., 828 F.2d 211, 220 (4th Cir.1987); LaPorte Construction Co., Inc. v. Bayshore National Bank, 805 F.2d 1254, 1256 (5th Cir.1986). District courts in both the Sixth and Tenth Circuits have also followed the discovery rule. See Bath v. Bushkin, Gaims, Gaines & Jonas, 695 F.Supp. 1156, 1162 (D.Wyo.1988) (Tenth Circuit); MHC, Inc. v. International Union, United Mineworkers of America, 685 F.Supp. 1370, 1390 (E.D.Ky.1988) (Sixth Circuit). So has at least one other judge in this district. See Electronic Relays (India) Pvt., Ltd. v. Pascente, 610 F.Supp. 648, 653 (N.D.Ill. 1985) (Hart, J.). Only one circuit  the Third  has adopted a different rule. See Keystone Insurance Co. v. Houghton, 863 F.2d 1125, 1130 (3d Cir.1988). The Seventh Circuit has not yet addressed the issue.
In light of this vast support which other courts have given the discovery rule, this court finds no reason to retreat from its ruling in Abernathy.[3] Accordingly, in the *1238 instant case, the statute of limitations began to run on plaintiffs' RICO claim when plaintiffs either discovered or should have discovered that they sustained an injury from defendants' alleged pattern of racketeering. In their complaint, plaintiffs allege that they were injured as a result of defendants' numerous acts of mail fraud, which constitute racketeering acts under RICO. Plaintiffs claim that defendants began committing those acts of mail fraud in January of 1984. However, plaintiffs signed their initial investment contracts in February 1984. As discussed in the previous section, those contracts contained provisions expressly contrary to the misrepresentations and omissions on which plaintiffs base their RICO claim. As a result, plaintiffs should have been aware at the time they signed their initial investment contracts that they had sustained an injury from defendants' fraud. Therefore, under the discovery rule, the four-year statute of limitations on plaintiffs' RICO claim began to run when plaintiffs signed their initial investment contracts in February 1984, and it expired four years later in February 1988. Since plaintiffs did not file this action and the parties did not enter into any tolling agreement until well after February 1988, plaintiffs' RICO claim is time-barred.

III. Counts III-VI: Pendent State Claims

Defendants' motion also seeks dismissal of plaintiffs' pendent state claims for lack of subject matter jurisdiction in the event that summary judgment is granted on Counts I and II. However, since the court has determined that defendant is entitled to only partial summary judgment on Count I, defendants' argument with respect to plaintiffs' pendent state claims is inapplicable. Therefore, the court will not dismiss Counts III-VI for lack of subject matter jurisdiction.

CONCLUSION
The court denies defendants' motion for summary judgment on Count I to the extent that plaintiffs base their securities fraud claim on defendants' alleged misrepresentation that the Lowe Property had not been worked extensively by previous oil drillers. In all other respects, defendants' motion for summary judgment on Count I is granted. The court also grants defendants' motion for summary judgment on Count II and denies plaintiffs' motion to dismiss Counts III-VI for lack of subject matter jurisdiction.
IT IS SO ORDERED.
NOTES
[1] In December 1985, Miller and Jocheim formed defendant Strata Oil Corporation to engage in the business formerly engaged in by the Strata Partnership. As used in this opinion, "Strata Oil" refers to both the partnership and the corporation.
[2] The parties entered into a written agreement which tolled the statute of limitations on plaintiffs' claims from September 8, 1988 to March 31, 1989. Under that agreement, if plaintiffs did not discover defendants' fraud until after October 1, 1985, the filing of plaintiffs' federal securities claim on April 24, 1989, was within the three-year statute of limitations. Although defendant Joseph Jocheim did not sign the tolling agreement, he is amenable to suit as a general partner of Strata Oil, which did sign the agreement.
[3] Some courts have opposed the discovery rule on the grounds that under the rule, plaintiff might discover his injury before his RICO claim completely matures, i.e. before defendant has committed a pattern of racketeering, and in that case the statute of limitations might run out before plaintiff actually has a claim. See Keystone, 863 F.2d at 1134. This court, however, need not concern itself with such an inequitable circumstance. The rule this court adopts is that the statute of limitations begins to run when plaintiff discovers or should discover that he has been injured as a result of a RICO violation. Under this rule, there must be a viable RICO claim before the limitations period begins to run. Plaintiff, however, need not be aware that a RICO violation has occurred for the statute to begin to run; the limitations period begins when there is a RICO violation and plaintiff is aware or should be aware that he has been injured. Accord, Bankers Trust, 859 F.2d at 1102 ("... each time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury.").