**Carol Marks JACOBSOHN, Plaintiff,**

v.

**Louis MARKS, Jerrold Marks, Martin Rosenfield, Richard Rosenfield, Evergreen Theatre Corporation, Fine Arts Theatres, Inc., Hillside Square Theatres, Inc., M & R Theatres, Inc., and its subsidiaries, Norran Corporation, Old Orchard Theatre Co., Evanston Theatres, Inc., Hyde Park Theatres, Inc., Dearborn Theatres, Inc., River Run Theatres, Inc., Webster Place Theatres, Inc., and M & R Management Corporation, Old Orchard Carwash, Inc., and Loews Chicago Cinema, Inc., Defendants.**

No. 92 C 6796.

United States District Court,
N.D. Illinois, E.D.

April 1, 1993.

Michael B. Roche, James Dominick Adducci, Jeffrey Edward Schiller, Nancy Anne O'Brien–Kane, Schuyler, Roche & Zwirner, Chicago, IL, for plaintiff.

Barry Stuart Rosen, Joel Nevin Shapiro, Lowell E. Sachnoff, Arthur D. Gunther, Sachnoff & Weaver, Ltd., James G. Hunter, Jr., Latham & Watkins, Chicago, IL, Watson B. Tucker, Robin L. Fenton–Roberts, Kirsten J. Felling, Mayer, Brown & Platt, Chicago, IL, for defendants.

## OPINION AND ORDER

NORGLE, District Judge:

Before the court is plaintiff Carol Marks Jacobsohn's ("plaintiff") objections to Magistrate Judge Edward A. Bobrick's February 26, 1993 Report and Recommendation ("Report," attached as Exhibit A). For reasons outlined below, the court sustains the objections, rejects the Report, and recommits the matter to the Magistrate Judge for ruling on the remaining motions.

## BACKGROUND

Pursuant to 28 U.S.C. § 636(b)(1)(B), the court referred to the Magistrate Judge the individual defendants'[1] motion for summary judgment and all defendants' motions to dismiss. After hearing the motions, the Magistrate Judge issued a nineteen-page Report recommending that the motion for summary judgment be granted as to the counts under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(b), (c), on statute of limitations grounds, and that the remaining counts thus be dismissed for lack of subject matter jurisdiction.

The facts underlying the present controversy are detailed in the Report and need not be repeated in full. In brief, it is plaintiff's position that the racketeering activities of the individual defendants caused her business interest in the original companies, with which she was involved, to be diluted by the investments in the new enterprises; these investments were accomplished through the individual defendants' use of intracompany funds. Plaintiff's position is that she needed to become a shareholder in the newly formed theatre corporations in order to maintain her overall level of interest in the family business. The individual defendants therefore allegedly committed fraud by failing to disclose material information regarding the funds used for the investments and other

---

1. The court will use "individual defendants" to refer to the defendants who are not corporate entities and who are alleged to be involved in the racketeering activities underlying the RICO suit.

aspects of the transactions that would have otherwise caused plaintiff to participate in the investments. The individual defendants then obtained a superior financial position in the family business when it was sold to Loews. The individual defendants' fiduciary duties supposedly arose from their positions as directors and officers of the M & R theatre corporations, as well as their familial relationships. Plaintiff alleges that she would have invested in the new corporations in order to maintain her previously existing interest in the business. Therefore, but for the individual defendants' fraud, plaintiff would have possessed a greater financial interest in the business.

The Magistrate Judge determined that the RICO claims were barred by the applicable statute of limitations because plaintiff discovered or reasonably should have discovered the RICO violation in 1984. Objections to the Report were filed March 15, 1993, and the issues are now ripe for consideration by this court.

## DISCUSSION

The court has completely reviewed the Report and arguments of counsel *de novo*. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b). The Court finds plaintiff's objections to have merit. The court does not adopt the recommended decision but instead denies the motion for summary judgment. On the current record, there exists a factual dispute as to whether or when a RICO injury occurred, namely the dilution of her interest in the M & R businesses, and also whether plaintiff was aware or should have been aware of that injury. Therefore, the court cannot find that her action is barred by the statute of limitations. Nonetheless, the Magistrate Judge has had more involvement with the substantive issues of this case up to its present point and therefore the matter is recommitted to the Magistrate Judge to issue a recommendation on the remaining fully briefed motions.

■ RICO allows a person to bring a civil action against people who, through a "pattern of racketeering activity," associate with or operate "enterprises." *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1464 (7th Cir.1992) (citing 18 U.S.C. § 1962(a)–(d)). To recover, the plaintiff must establish (1) that the defendant violated the statute, which includes that the defendant participated in a pattern of racketeering, and (2) that the plaintiff sustained an injury to business or property. *Id.* A cause of action does not accrue until a pattern of racketeering exists and an injury has been sustained. *Id.* at 1465. Accordingly, the four-year statute of limitations for civil RICO claims begins to run once there is a RICO violation and the plaintiff knew or should have known that he or she was injured. *Id.* at 1464–65; *see also In re VMS Limited Partnership Sec. Litig.*, 803 F.Supp. 179, 188 (N.D.Ill.1992).

■ Plaintiff urges the court to hold that she was injured and that she discovered the injury at the time the sale was made to Loews theatre. The court does not take the position that the sale was the point in time the injury was sustained, nor, however, does it take the position that the evidence conclusively demonstrates that the sale is the point at which plaintiff became aware of an injury. Instead, the court finds there is a genuine issue of fact on when the injury occurred and when plaintiff became aware of a RICO injury.

Under RICO, "injury" means damage to business or property. 18 U.S.C. § 1964. The Magistrate Judge believed that plaintiff was injured by not investing in the new theatre corporations and that she learned of the injury *when she discovered the truth underlying the alleged omissions*, Report, at 16, which was, in the Magistrate Judge's view, at the time of the original investments. But this is too akin to knowledge of the racketeering activities of the defendants and not the damage that her business or property interests would suffer. Also, if it is true that all information was disclosed to plaintiff at the time of the investment, then there could be no fraud. But plaintiff's allegations contain more than that the individual defendants hid the funding scheme for the new corporations. Plaintiff alleges that the defendants intentionally failed to reveal six factors: (1) that the assets and credit of the original corporations were used to fund the new corporations; (2) that the formation of the new entities were corporate opportunities of the original corporations; (3) that the defendants

were obtaining full ownership of all of the new corporations while making minimal personal capital contributions to them; (4) the basis upon which they rested their decision to invest their own assets as well as the original corporations' assets in the new enterprises; (5) that plaintiff could only effectively maintain her interest in the original corporations if she became a shareholder in the new corporations; and (6) that plaintiff's assets were already at risk, that her risk of loss from a small investment in the new corporations would be low, and those investments would create a potential for additional profits in return. Without vouching for the truth of these matters, the court accepts that these facts were not disclosed. Whether such conduct constitutes fraud under both common law and the federal mail and wire fraud statutes remains to be seen.

The Magistrate Judge believed that plaintiff could reasonably have known that, at the time the opportunities were offered, she must invest in the new enterprises to maintain the same level of interest in the M & R business as she previously held. But the facts supporting that position are not free from doubt. It may be that she had prior dealings in these areas and there was enough information for her to know she was losing her interest in the M & R businesses. True, if she had all the information regarding the financing of the new companies in her possession at the time the investments in the new companies were made, plaintiff may have been aware of the dilution of her business interests, or at least should have reasonably been aware. Plaintiff's cause of action would therefore accrue at that point. A person who knows of racketeering activities and the effect those activities would have on that person's business affairs or property rights should not be expected to wait until the full effect is realized, such as through the sale in this case, to file a suit. Once the investment was made, the injury was done. *See, e.g.,* *Radiology Center, S.C. v. Stifel, Nicolaus & Co.,* 1992 WL 225568, at *2, 1992 U.S.Dist.LEXIS 13584, at *5 (N.D.Ill. Sept. 8, 1992) (injury occurred when pension plan assets were used to purchase high-risk securities for purpose of generating commissions for the defendants and not for fulfilling plaintiffs' investment goals).

On the other hand, if the investments failed then there would be no injury (plaintiff would not be clamoring to get a piece of the loss), and thus "no blood, no foul." *McCool,* 972 F.2d at 1466. To accept the Magistrate Judge's position that plaintiff knew of her injury (missed investment opportunities) at the time the truth of the financing was revealed (contemporaneous with the investments) and that this discovery thus started the statute of limitations time-clock running, the court must assume that plaintiff's injury also occurred at the time the investments in the new companies were made. And even assuming plaintiff's theory of RICO is correct, the injury may have been sustained at the time of the investments in the new companies. Nevertheless, it is not established that there was an injury at that point. Additionally, it still may not have been until the sale to Loews that plaintiff became aware that fraud was afoot and that she consequently had a disproportionate interest in the M & R businesses. *See, e.g., Cruden v. Bank of New York,* 957 F.2d 961, 977–78 (2d Cir. 1992) (injury occurred at time of default on debentures; at time of fraudulent transfers, injury was too speculative and not remediable under § 1964(c)).

The facts show that plaintiff has little experience in corporate matters and supposedly relied entirely on the individual defendants to protect her interests. The individual defendants, experienced businessmen, allegedly failed to disclose facts to plaintiff that were necessary for her to maintain her interest. There are no facts in the record, beyond the ambiguous deposition testimony in an unrelated case, to establish exactly what she knew about the new theatre corporations.

The Magistrate Judge primarily and substantially relied upon plaintiff's deposition testimony from a state court probate proceeding in concluding that she had sufficient knowledge of the business affairs. But the court perceives more ambiguity in that testimony than the Magistrate Judge, especially when viewed in a light more favorable to plaintiff, and therefore finds her statements subject to a factfinder's interpretation. The June 1989 deposition proceeded as follows:

Q: You were offered, were you not, the opportunity to invest in the Hyde Park and Evanston Theatres?

A: I was asked to participate in those theatres.

Q: And you chose not to do so?

A: I felt that if they financed them through properties in which the estate had an interest, I would automatically participate by my shares and ownership in the estate.

\* \* \* \* \* \*

Q: Can you explain how you believed you would automatically participate?

A: Well, it just seemed very logical that if properties in which I personally or the estate had ownership made loans to new properties, that there would be an automatic participation by the properties from which the loans came.

Q: And did you ever express that understanding at the time that the development of the Evanston Theatre was being discussed ...?

A: The subject never came up.

The Magistrate Judge determined that plaintiff was attempting chicanery by arguing that, "when it came time to decide whether to invest in the new theatre corporations, she had no idea how they were financed, but for the purposes of discovering her injury ... she knew exactly how they were financed but was operating under a misapprehension as to the effect of that financing." Report, at 16–17. But plaintiff was not deposed on the precise question as to when she discovered her injury or whether she knew that the investments were financed through inter-company assets. Furthermore, the testimony may demonstrate that she was aware that there was a possibility that inter-company funds could be used, but it does not conclusively demonstrate that she was aware that, insofar as these precise investments were concerned, corporate assets were involved. Although admissions can be a "trump" in a summary judgment motion under the proper circumstances, *see Reed v. Gardner*, 986 F.2d 1122, 1129 (7th Cir.1993), these are not the right circumstances. Her deposition testimony, and the other facts on record, do not demonstrate that things were "so clearly amiss" such that the court "could conclude that plaintiff[ ] should have discovered the alleged fraud" at the time the investments were offered to her or were made. *See VMS Ltd. Partnership*, 803 F.Supp. at 191.

In sum, the Magistrate Judge's equating of plaintiff's discovery of her injury with her knowledge of "the truth underlying the alleged omissions" is erroneous in light of the ambiguity of plaintiff's deposition testimony and ambiguity regarding when an actual injury was discovered. *See McCool*, 972 F.2d at 1465–66 (accrual of cause of action depends on existence of injury); *Cruden*, 957 F.2d at 977 (same). Also, that she was aware of the intra-company funding scheme at the time of the investments is not clearly undisputed. It may very well be that plaintiff is essentially alleging "that the individual defendants failed to adequately entice [her] to participate in a series of low-risk investment opportunities" which plaintiff should have known were clear corporate opportunities, and it may be that these activities do not amount to a "lengthy period of racketeering activity or a threat of continued criminal activity" from a common sense standpoint such as to impose civil liability under RICO. *See* Report, at 18. There may have been no duty to provide such information to plaintiff. Additionally, the Magistrate Judge is rightfully concerned with applying RICO to this family dispute. There should certainly exist genuine controls over how far civil RICO's reach should extend and over the types of activities governed by the statute. *See generally* Thurgood Marshall, *Misinterpreting RICO, in The RICO Racket* 59 (Nat'l Legal Center for the Public Interest, Sept.1989); William H. Rehnquist, *Reforming RICO, in The RICO Racket* 63 (Nat'l Legal Center for the Public Interest, Sept.1989). Nonetheless, the court finds that the Magistrate Judge should determine the remaining issues in the first instance.

CONCLUSION

Accordingly, the Court rejects the Magistrate Judge's February 26, 1993 Report and Recommendation and recommits the matter for further proceedings pursuant to 28

U.S.C. § 636(b)(1). The motion for summary judgment is denied.

IT IS SO ORDERED.

## EXHIBIT A

### REPORT AND RECOMMENDATION of Magistrate Judge Edward A. Bobrick

Before the court are the combined motions of defendants Louis Mark, Jerrold Marks, Martin Rosenfield, Richard Rosenfield, and Loews Chicago Cinema, Inc. ("Loews"), for summary judgment on, or dismissal of, the complaint of plaintiff Carol Marks Jacobsohn.

The plaintiff filed this action on October 8, 1992 against her sons, Louis and Jerrold Marks, her brother-in-law, Martin Rosenfield, her nephew, Richard Rosenfield ("the individual defendants"), various corporations in which she either held a minority interest or claims she should have received a minority interest, and Loews. The dispute involves competing interests over the Marks and Rosenfield ("M & R") family business which, for the most part, was a chain of Chicagoland movie theatres. Essentially, plaintiff alleges that the individual defendants participated in a scheme whereby they loaned funds from certain old theatre corporations in the chain in which plaintiff held a minority interest to newly formed theatre corporations in which they alone held interests, without explaining these transactions, or their effect, to plaintiff. The effect was that plaintiff needed to become a shareholder in the newly formed theatre corporations in order to maintain her overall level of interest in the M & R family businesses. Despite the fact that the individual defendants offered plaintiff the opportunity to invest on each occasion a new theatre corporation was formed, plaintiff chose not to. In addition, plaintiff claims the individual defendants improperly allocated the proceeds of the sale of the M & R family business to Loews by distributing the lion's share to the newly formed theatre corporations, thereby adversely affecting plaintiff's take. Plaintiff contends that the individual defendants' conduct violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(b); (c) ("RICO"), as well as certain common law provisions. She seeks not only damages, but the recision of the sale to Loews. The individual defendants have moved for dismissal or summary judgment on various theories, including *res judicata*, collateral estoppel, failure to state a cause of action under RICO, and the statute of limitations. Loews has moved to dismiss so much of plaintiff's action that pertains to recision of the sale, now more than five years old.

## I. BACKGROUND

To paraphrase the Illinois Appellate Court for the Second District, this case represents yet "another chapter in the sad and bitter saga of the Marks family." *In re Estate of Marks*, 231 Ill.App.3d 313, [172 Ill.Dec. 356, 357,] 595 N.E.2d 717, 718 (2d Dist.1992) (*"Marks II "*). The M & R theatre business stems back to the 1950's, when plaintiff's late husband, Raymond Marks, his brother, Jerome Marks, and his brother-in-law, Martin Rosenfield, formed a chain of movie houses in the Chicago area. The business expanded somewhat into non-theatre-related areas, but remained primarily a closely-held corporate entity in the Marks and Rosenfield families. Over the years, essentially through gifts, plaintiff herself became a minority shareholder in the M & R theatre business.

At the time of Raymond Marks' death in May, 1982, his estate included stock in 24 closely-held corporations, and he held a 35% interest in M & R theatres and properties. *See, generally, Marks II*, [172 Ill.Dec. at 357,] 595 N.E.2d at 718; *In re Estate of Marks*, 211 Ill.App.3d 53, [155 Ill.Dec. 731, 733–734,] 569 N.E.2d 1342, 1344–45 (2d Dist. 1991) (*"Marks I "*). Raymond Marks' bequest to plaintiff was "a pecuniary amount equal to three-fourths the value of [his] adjusted gross estate..." *Marks I*, [155 Ill. Dec. at 733,] 569 N.E.2d at 1344. His sons, individual defendants Jerrold and Louis, were to receive 12½% each. *Id.* at [734, 569 N.E.2d at] 1345. Rather than describe the tenor of the instant case, we need only point out that *ten years* after Raymond's death, disputes over the distribution of his estate had yet to be finally resolved. *Marks II*, [172 Ill.Dec. at 357–59, 366–67,] 595 N.E.2d at 718–20, 727–28.

Prior to their father's death, individual defendants Louis and Jerrold worked for M & R for a number of years, learning their fa-

ther's business practices. When Raymond died, the sons essentially took over the management of the family business and, from 1983 to 1987, set about on a course of expansion. In doing so, the sons followed a practice their father had followed in years past: they lent money from the existing M & R theatre corporations to the newly formed theatre corporations. *Marks II,* [172 Ill.Dec. at 365,] 595 N.E.2d at 726. These new theatre corporations were the Fine Arts Theatres, the Evanston Theatres, the Hyde Park Theatres, the Dearborn Theatres, the River Run Theatres, the Webster Place Theatres, and the M & R Management Corporation. (Complaint, ¶ 19). The practice of using "old" theatre corporation money to fund new theatre corporations had the practical effect of allowing the individual defendants to gain controlling equity interests in the new theatre corporations with minimal investment. By way of example, we cite the plaintiff's allegations with respect to the first new theatre corporation formed after Raymond's death, the Fine Arts Theatre, which was formed December 8, 1982, and funded in February, 1983, with just $3,000 in equity in the following manner:

a. The Individual Defendants caused Hillside Square Theatres, Inc., to loan $175,000 to Fine Arts Theatres, Inc.;

b. The Individual Defendants caused another company, Concession Services, Inc., to loan $250,000 to Fine Arts Theatres, Inc.;

c. Jerrold and Louis each contributed $600, for which each took a 20 percent equity interest in Fine Arts Theatres, Inc.;

d. Martin and Richard each contributed $750, for which each took a 25 percent equity interest in Fine Arts Theatres, Inc.;

e. [Plaintiff] contributed $300, for which she was given a 10 percent equity interest in Fine Arts Theatres, Inc.

(Complaint, ¶ 26). The remaining new theatre transactions followed similar lines (Complaint, ¶¶ 27–33), although plaintiff chose not to participate in any transaction other than the Fine Arts Theatres.

Plaintiff alleges that her failure to participate in the ensuing transactions was due to the individual defendants' failure to inform her of the benefits of participation. Specifically, plaintiff claims that the individual defendants purposely failed to reveal that:

a. That the assets and credit of the Original Corporations were being used to fund the New Theatre Corporations;

b. That the formation of the entities incorporated as the New Theatre Corporations were corporate opportunities of the Original Corporations;

c. That the Individual Defendants were obtaining full ownership of all of the New Theatre Corporations (except Fine Arts Theatres, Inc.) while making minimal personal capital contributions in them;

d. The basis upon which they decided to invest their own and the Original Corporations' assets in the New Theatre Corporations;

e. That the only way [plaintiff] could effectively maintain her interest in the Original Corporations was to become a shareholder in the New Theatre Corporations; and

f. That in view of the Individual Defendants' use of assets of the Original Corporations as the primary source of funding for the New Theatre Corporations, and the Individual Defendants' minimal capital contributions in the New Theatre Corporations, [plaintiff's] assets were already at risk, her incremental risk of loss from a small capital investment in the New Theatre Corporations would be extremely low, and investment in those corporations would create a potential for additional profits in return.

(Complaint, ¶ 23). Plaintiff's interpretation of the new theatre corporation transactions at the time the individual defendants allegedly withheld the above-cited information is further illustrated by her deposition testimony during the pendency of the Marks estate probate case in June of 1989. At that time, plaintiff testified as follows about the Hyde

Park and Evanston Theatre transactions, which occurred in June and July of 1984:

Q. You were offered, were you not, the opportunity to invest in the Hyde Park and Evanston Theatres?

A. I was asked to participate in those theatres.

Q. And you chose not to do so?

A. I felt that if they financed them through properties in which the estate had an interest, I would automatically participate by my shares and ownership in the estate.

  &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

Q. Can you explain how you believed you would automatically participate?

A. Well, it just seemed very logical that if properties in which I personally or the estate had ownership made loans to new properties, that there would be an automatic participation by the properties from which the loans came.

Q. And did you ever express that understanding at the time that the development of the Evanston Theatre was being discussed to Louis or Jerrold?

A. The subject never came up.

Q. And isn't it true that you never ever mentioned that understanding or belief to either Richard or Martin Rosenfield?

A. I never discussed any of my personal shareholdings with Richard or Marty Rosenfield.

(Memorandum of Law in Support of Marks' Motion, Jacobsohn Dep., pp. 43–46). Whatever plaintiff believed, the financial risk inherent in the formation of the new theatre corporations was on the old theatre corporations of which plaintiff was a shareholder, while the risk of investment in the new theatre corporations was small: it would appear that 1% of equity interest could be had for every $30 invested. (Complaint, ¶¶ 26–31).

To summarize plaintiff's contentions to this point, it would appear that she had the opportunity to invest at minimal risk in the newly formed theatre corporations, she chose not to because of the individual defendants' failure to provide her with the information she feels was necessary to make such a decision. She claims that this failure was a breach of the individual defendants' fiduciary duty to her; a fiduciary duty that arose out of the individual defendants' positions as directors and officers of the M & R theatre corporations, as well as their familial relationships. Plaintiff's allegations, then, present the somewhat novel claim that fraudulent omissions influenced her not to invest in a financial opportunity, as opposed to the garden-variety claim wherein a plaintiff is influenced *to* invest in a financial opportunity. She is crying foul because of missing an opportunity to make money, rather than being defrauded out of money in an investment scheme.

According to plaintiff's complaint, her decision not to invest in the new theatre corporations would have future repercussions. In mid–1986, the federal government's relaxation of certain antitrust regulations resulted in a substantial increase in theatre purchase prices. The individual defendants began a search for a buyer and, to make the M & R theatre business more attractive, formed several of the new theatre corporations to fill "geographic holes" in the M & R domain. By 1988, Loews had expressed interest in purchasing the M & R theatre corporations. To facilitate the sale, the individual defendants caused certain of the old theatre corporations to buy out the interests the Goldberg and Rosenbaum families held in the theatre corporations, at a premium price. In addition, the individual defendants purchased the Goldberg–Rosenbaum interest in one of the M & R corporations, the Old Orchard Land Trust, through their children's trusts. Unlike the balance of the buyout, then, plaintiff had no participation in the Old Orchard Land Trust buyout. (Complaint, ¶ 56).

On November 3, 1988, the individual defendants caused the M & R theatre business to enter an agreement with Loews whereby Loews purchased the M & R operations and buildings for a total of $67.5 million. Plaintiff's complaint sets out the allocation of funds from the sale as follows; we indicate those corporations in which plaintiff held an interest with an asterisk:

| | |
|---|---:|
| *Bel Air Realty Company | $ 44,000 |
| Double Drive-in Corporation | 369,000 |
| Evanston Theatres, Inc. | 4,800,000 |
| *Evergreen Theatres Corporation | 3,600,000 |
| *Fine Arts Theatres, Inc. | 4,900,000 |
| *Hillside Amusement Corporation | 1,900,000 |
| *Hillside Square Theatres, Inc. | 9,000,000 |
| Hyde Park Theatre Associates by Hyde Park Theatre, Inc. | 3,600,000 |
| M & R Management Corporation (Esquire) | 1,500,000 |
| *M & R Theatres, Inc. | 735,000 |
| *Norran Corporation (Norridge) | 10,879,986 |
| *Norridge Realty | 1,420,014 |
| *Old Orchard Theatre Company | 5,300,000 |
| River Run Theatres, Inc. | 6,971,000 |
| Webster Place Theatres, Inc. | 9,178,000 |
| Y & W Theatres, Inc. | 200,000 |
| | $64,397,000 |
| | |
| Non–Compete Payments to Richard, Jerrold, Louis and Steven [sic] Rosenfield | 3,103,000 |
| | $67,500,000 |

(Complaint, ¶ 41; *cf.* ¶ 11). A review of plaintiff's allegations regarding the sale price allocation reveals that approximately 58.7% of the sale price was allocated to old theatre corporations in which plaintiff held an interest. Plaintiff characterizes the allocation as improper in that a disproportionate amount of the sales proceeds went to new theatre corporations in which plaintiff held no interest. Consequently, plaintiff alleges that she was damaged in that the proceeds assigned to corporations in which she held interests were insufficient. In addition, plaintiff complains that she received no benefits in the nature of salaries or covenants not to compete, while the individual defendants did. (Complaint, ¶¶ 45–46). Plaintiff does not allege, however, that she played any role whatsoever in the management of the M & R family business at any time.

Based on the foregoing allegations, plaintiff brings four RICO counts in her complaint. In Counts I and II, plaintiff alleges that the individual defendants violated 18 U.S.C. § 1962(b) by engaging in acts of racketeering, through the United States mails, whereby they acquired the new theatre corporations to the exclusion of plaintiff. Plaintiff alleges her exclusion was a result of individual defendants' failure to disclose to plaintiff the minimal risk involved in investing in the new theatre corporations, and the fact that investing would allow her to maintain her overall interest in the M & R theatre corporations. In Counts III and IV, plaintiff alleges that individual defendants, through the aforementioned conduct, combined with the allocation of Loews sale proceeds, violated 18 U.S.C. § 1962(c), by conducting M & R theatre corporations' affairs through a pattern of racketeering. Plaintiff adds state law claims in Counts V through VII, asking, *inter alia,* that the Loews sale be set aside under the Illinois Business Corporations Act. As already noted, the individual defendants and Loews move, under various theories, to dismiss the plaintiff's complaint. The individual defendants also move for summary judgment against plaintiff, arguing that RICO's statute of limitations bars plaintiff's RICO claims. After consideration of the parties' submissions, we find that this matter may be resolved solely in the context of the individual defendants' motion for summary judgment. This being the case, we find no need to address each and every theory or argument raised by the defendants in their motion to dismiss.

## II. ANALYSIS

### A. *Summary Judgment*

In order for a party to prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). In the context of a summary judgment proceeding, the court does not weigh evidence to determine the truth of asserted matters, but simply determines whether there is a genuine issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511[, 91 L.Ed.2d 202] (1986). When a defendant moves for summary judgment, it must demonstrate, based on the record, that there is an absence of evidence to support the plaintiff's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553[, 91 L.Ed.2d 265] (1986). Similarly, a plaintiff cannot rest on mere allegations of a claim, especially with respect to an issue on which it bears the burden of proof, but must affirmatively demonstrate through a specific, factual showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 322–24, 106 S.Ct. at 2552–53. Summary judgment is appropriate when the evidence supporting the non-movant is merely colorable or is not significantly probative. *Bank Leumi, Le-Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). In this case, we may resolve the statute of limitations question upon which the individual defendants base their summary judgment motion through consideration of the essentially uncontroverted factual record and plaintiff's allegations.

### B. *RICO's Statute of Limitations*

The statute of limitations applicable to civil RICO claims is four years. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 149–154, 107 S.Ct. 2759, 2764–66[, 97 L.Ed.2d 121] (1987). Under the fairly recent Seventh Circuit opinion in *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir.1992), a RICO claim accrues when the plaintiff discovers her injury, even if she has not yet discovered the underlying "pattern of racketeering"—an element necessary to all RICO claims. The parties here are at odds over when plaintiff discovered her injury, thereby triggering the four-year statute of limitations.

We begin our analysis of this question with plaintiff's complaint. Plaintiff pleads compliance with the applicable statute of limitations in a section of her complaint entitled "Plaintiff's Discovery of Her Injury." There, plaintiff reiterates her contentions that the individual defendants failed to adequately inform her of the ramifications of failing to invest in the new theatre corporations, despite the fact that she met regularly with them and consulted them concerning her interest in the M & R family business. (Complaint, ¶ 74). According to plaintiff, it was not until she consulted an attorney in December, 1988, that she learned the assets of the old theatre corporations, through intercompany loans, were used to fund the new corporations, and that the allocation of the Loews sale purportedly favored the new corporations. (Complaint, ¶ 77). Because she filed this action within four years of December, 1988, plaintiff argues that her complaint is not time-barred.

There are certain factors that undermine plaintiff's version of her discovery of her injury in this case, not to mention her complaint in general. First, it is undisputed that every time the individual defendants formed a new theatre corporation, they offered plaintiff the opportunity to invest. The very first time they did so—with respect to the Fine Arts Theatre in February, 1983—plaintiff agreed to invest and, for a mere $300, received a ten percent interest. Based on plaintiff's complaint, one of the two main reasons she chose not to invest the next time—with respect to the Evanston Theatre in November, 1984—and thereafter, was because the individual defendants failed to inform her that "in view of the very small capital contribution to be made to each of those corporations, the risk of personally investing in the New Theatre Corporations was low ..." (Complaint, ¶¶ 23(p); 24(a)). We are asked to believe plaintiff was misled in this fashion despite the fact that she gained a ten percent interest in a multi-theatre, Michigan Avenue complex for just $300 a year-and-a-half earlier. It strains all credulity to think that plaintiff was unaware of the mini-

mal capital risk involved in the new theatre corporations—one of two material omissions she alleges defendants made—after she reaped the benefits of that minimal risk in February, 1983.

Second, if we accept plaintiff's allegations as true, the other material omission that forms the basis of her RICO complaint and gives rise to her discovery of her injury was the fact that the new corporations were funded by old corporation assets, thereby shifting the greatest risk of loss to the old corporations by virtue of loans to the new corporations. (Complaint, ¶¶ 23–24). According to her complaint, plaintiff did not learn of this funding strategy until December of 1988. Her allegations as to her discovery, however, are undermined by her own past testimony. As earlier noted, plaintiff's deposition testimony during the pendency of the Marks estate probate case reflected her understanding of the financing of the new theatre corporations at the time she initially decided not to invest, in mid–1984. In that testimony, plaintiff states she "felt that if they financed them through properties in which the estate had an interest, [she] would automatically participate by [her] shares and ownership in the estate." *Supra,* at 1190. Any reasonable interpretation of that testimony would suggest that plaintiff's decision not to invest was based on her belief that she would adequately participate in the new theatre corporations by way of her interest in the old theatre corporations, which were supplying the financing; in other words, that plaintiff was well aware of the manner in which the new theatre corporations were being financed, and any detriment to her interests that would reasonably flow therefrom. Attempting to refute this logical interpretation, plaintiff contends that her testimony was merely a hypothetical; in essence, she was stating what her understanding would be *supposing* the new theatre corporations were funded through old theatre corporation assets. (Plaintiff's Memorandum in Opposition, pp. 53–56). The question put to plaintiff, however, was not a hypothetical, it was a request for the basis of her decision not to invest in the new theatre corporations. To interpret her testimony as positing a supposition, again, strains credulity. Accordingly, we must reject plaintiff's characterization of what she knew—or did not know—about the financing of, and investment risk regarding, the new theatre corporations at the time she chose not to invest.

As already noted, the manner of financing the new theatre corporations and the minimal financial risk involved in investing are the two allegedly fraudulent omissions upon which plaintiff bases her complaint. The record, consisting of plaintiff's complaint and her own deposition testimony demonstrates that she was aware of the truth underlying these purported omissions as early as 1984. The RICO statute begins to run, however, when a plaintiff is aware of an injury, if not a pattern of racketeering. *McCool,* 972 F.2d at 1465. Plaintiff argues that, even if she was aware of the alleged omissions in 1984, she did not become aware of any *injury* until 1988. We must determine, then, exactly how "injury" would be defined in the context of plaintiff's complaint.

Plaintiff defines her injury in various ways throughout her complaint. Initially, she states that, because of the individual defendants' omissions, she:

> ... did not understand investment in the New Theatre Corporations was a low-risk investment opportunity because: (a) in view of the very small capital contribute to be made to each of those corporations, the risk of personally investing in the New Theatre Corporations was low; and (b) the greatest risk of loss was shifted to the Original Corporations by virtue of the substantial loans they made to the New Theatre Corporations. Consequently, [plaintiff] did not become a shareholder of the New Theatre Corporations (with the exception of Fine Arts Theatres, Inc.).

(Complaint, ¶ 24). Later, plaintiff states that the manner of financing the new theatre corporations put her interest in the old theatre corporations at risk, but:

> ... she received little, if any, corresponding benefit. [Plaintiff] did not invest in the New Theatre Corporations (except for Fine Arts Theatres, Inc.) because the Individual Defendants failed to disclose to her the material facts set forth in paragraph 23 above.

(Complaint, ¶ 34). Still later, plaintiff essentially characterizes her injury as the fact that the assets of the old theatre corporations were used to fund the new theatre corporations, which she purportedly discovered in December of 1988. (Complaint, ¶ 77). Based on plaintiff's complaint, it would appear that she feels she was injured by not investing in the new theatre corporations and that she learned of the injury when she discovered the truth underlying the alleged omissions. If that is indeed the case, then plaintiff learned of her injury in 1984 when, contrary to her allegations in paragraph 77, she knew exactly the manner in which the new theatre corporations were financed. Based upon a thorough reading of plaintiff's allegations, then, plaintiff's RICO claims are clearly time-barred.

For the sake of comprehensiveness, we will address plaintiff's argument against this conclusion, although we find her argument disingenuous. Plaintiff, taking a position contradictory to both her aforementioned characterization of her deposition testimony and the allegations of her complaint, argues that her deposition testimony was not hypothetical at all, but reflected her understanding that she would participate in the new theatre corporations insofar as they were funded through old theatre corporation assets. (Plaintiff's Memorandum in Opposition, at 53–54). She claims she learned this understanding was incorrect in 1988, after she hired an attorney. (Id., at 54). Plaintiff, in essence, would have us believe that, when it came time to decide whether to invest in the new theatre corporations, she had no idea how they were financed, but, for the purposes of discovering her injury and bringing her complaint into compliance with the statute of limitations, she knew exactly how they were financed but was operating under a misapprehension as to the effect of that financing. She cannot have it both ways.

In short, plaintiff's perceived injury in this case is that "she was being barred from participation" in the new theatre corporations. (Id., at 54). She alleges she was so barred as a result of the fraudulent omissions of the individual defendants as to the minimal risk involved in investing and the manner in which the new theatre corporations were financed. She makes these allegations despite the facts that (1) the individual defendants offered her the opportunity to invest each time a new theatre corporation was formed; (2) she was aware a $300 investment would net a ten percent interest in a new theatre corporation in 1983; and (3) she was aware of the manner in which the new theatre corporations were financed in 1984 through intercompany loans. If plaintiff has any RICO claim at all—and it is, indeed, speculative—we must find that she was aware of it at least as early as 1984, when she knew the truth underlying the individual defendants' alleged omissions regarding financing, and perhaps as early as 1983, when she first reaped the benefits of the minimal capital risk involved in investing; a minimal risk she claims the individual defendants failed to disclose to her. In any event, plaintiff's RICO claims, all four counts of which are based on the aforementioned purported omissions, are time-barred by the applicable four-year statute of limitations.

## III. CONCLUSION

We harbor serious doubt as to whether plaintiff's complaint adequately states a cause of action for fraud, let alone RICO violations. As the Seventh Circuit has said, the sufficiency of RICO allegations must be analyzed "with an eye toward achieving a 'natural and common sense result.'" *420 East Ohio Ltd. Partnership v. Cocose*, 980 F.2d 1122, 1124 (7th Cir.1992) (*citing United States Textiles, Inc. v. Anheuser–Busch Cos.*, 911 F.2d 1261, 1267 (7th Cir.1990)). The complaint herein, as we have noted, is essentially an allegation that the individual defendants failed to adequately entice plaintiff to participate in a series of low-risk investment opportunities. From a common sense standpoint, based on all of the parties' submissions, the complaint does not evince a "lengthy period of racketeering activity or a threat of continued criminal activity." *Cocose*, 980 F.2d at 1124. The complaint suggests, instead, that a dispute over a family estate has been made into the proverbial federal case. Rather than address these pleading inadequacies and thereby invite plaintiff to attempt corrections and refile, we resolve this matter under the applicable statute of limitations. Combining the record,

such as it is, with plaintiff's own allegations leads to the determination that plaintiff knew of the purported omissions upon which she based her cause of action, and the accompanying injuries, approximately eight years prior to bringing this cause of action. As the applicable statute of limitations for RICO claims is four years, plaintiff's RICO claims are time-barred. Plaintiff's federal claims being thus disposed, her common and state law claims should be dismissed for lack of jurisdiction. 28 U.S.C. § 1367(c). In this regard, we note that disposal of plaintiff's federal claims leaves this court with no jurisdiction over plaintiff's claim against Loews, as it is a state law matter in which there is no diversity of citizenship between the parties, both being Illinois citizens. Accordingly, Loews should be dismissed as a defendant as well.

For the foregoing reasons, it is hereby recommended that the individual defendants' motion for summary judgment be granted, that the non-federal claims be dismissed, and that Loews' motion to dismiss be granted.

Respectfully submitted,

DATE: February 26, 1993

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140[, 106 S.Ct. 466, 88 L.Ed.2d 435] (1985); *The Provident Bank v. Manor Steel Corp.,* 882 F.2d 258 (7th Cir.1989).